1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INTELLISOFT, Ltd,

             Plaintiff,

   v.

ACER AMERICA CORPORATION, et al.,

             Defendants.

Case No. 17-cv-06272-PJH

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 64

Defendants Acer America Corporation and Acer Inc.'s ("Acer") motion for summary judgment came on for hearing before this court on October 10, 2018. Plaintiff Intellisoft, Ltd. appeared through its counsel, Alfredo Torrijos, Daniel Balaban, and Andrew Spielberger. Defendants appeared through their counsel, Mathew Ball, Jason Haycock, and Jeffrey Johnson. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS defendants' motion, for the following reasons.

## BACKGROUND

**A.**    **Procedural Background[1]**

This court previously summarized the action as follows:

> On March 21, 2014, [Bruce] Bierman and Intellisoft filed this action in the Superior Court of the State of California for the County of Marin against [Acer]. Bierman later voluntarily dismissed himself from the case and assigned his interest to

---

[1] Defendants are reminded that L.R. 3-4(c)(3) requires that "type may not be smaller than 12-point standard font[;]" not 11.5-point.

Intellisoft. In brief, Intellisoft alleges that Bierman invented certain trade secrets related to computer power management. Fourth Amended Complaint ("4thAC"), ¶¶ 41-65 [Ball Ex. 14]. Intellisoft further alleges that in the early 1990s, Bierman shared those purported trade secrets with Acer pursuant to a non-disclosure agreement, that Acer stole those trade secrets, and that Acer obtained a series of patents (the "'713 patents" or the "patents") based on those trade secrets without Bierman's knowledge. Id. ¶¶ 27-65. On September 25, 2015, Intellisoft filed its fifth pleading, the 4thAC, asserting causes of action for: (1) misappropriation of trade secrets, (2) intentional misrepresentation and concealment, (3) breach of contract—non disclosure agreement, and (4) accounting. Id. ¶¶ 70-101.

Dkt. 57 at 1-2. The parties agree that the second and fourth causes of action rise and fall with the first and third causes of action.

On September 28, 2015, plaintiff produced its First Amended Designation of Trade Secrets pursuant to Cal. Civ. P. § 2019.210. Ball Ex. 35

Two years later, and after more than three years of litigation in state court, plaintiff produced three expert reports and defendants subsequently deposed two of those reporting experts. Together, the expert testimony revealed for the first time that plaintiff's entire theory of liability necessarily depends on plaintiff showing that Bierman, and not Acer's employees, conceived of the invention claimed by the '713 patents. See generally Dkt. 35 (Motion to Remand Order). Based on that new information defendants removed the action to this court and subsequently filed a counterclaim against plaintiff and Bierman seeking a declaratory judgment under the Federal Declaratory Judgment Act and 35 U.S.C. § 256 that Bierman was properly not named as an inventor of the '713 Family of Patents. See Dkt. 35 at 4-5 (discussing relevant history). The court subsequently denied Intellisoft's motion to remand because the court had federal subject-matter jurisdiction based on Acer's Declaratory Judgment Act counterclaim and under 28 U.S.C. §§ 1338 & 1441 because Intellisoft's state law claims necessarily raised substantial questions of patent law. See generally id.; Dkt. 57 at 2 (discussing order denying motion to remand).

Now before the court is defendants' motion for summary judgment. That motion primarily argues that because plaintiff's theory hinges on plaintiff showing that Bierman

conceived of the invention claimed by the '713 Family of Patents, federal patent law applies and that plaintiff cannot meet the applicable clear and convincing evidence standard. Plaintiff disagrees that patent law applies to the inventorship issue and also reargues that this court lacks jurisdiction. The court has rejected the latter contention on two prior occasions, see Dkts. 35, 57, and will not address it a third time here. Instead, the court focuses on what law applies to the inventorship issue and whether plaintiff's evidence satisfies its burden to survive summary judgment.

**B.    Acer and Intellisoft/Bierman's Business Relationship**

In September 1990, Intellisoft and Acer entered into a non-disclosure agreement. Ball Ex. 21 (the "NDA"). Defendants argue that the parties entered into the NDA because Intellisoft was going to alter its off-the-shelf software (henceforth, "Bookmark") for Acer's use. Plaintiff agrees but also contends that, pursuant to the NDA, Bierman disclosed to Acer hardware-related trade secrets. While the NDA prohibits generally the misappropriation of any confidential information, it only specifically references Intellisoft's software. Id.

On January 2, 1992, Acer applied for a patent entitled "Power-Management System for A Computer," 5,410,713, which named Dave White, Yen W. Lee, Rod Ang, Ray Barbieri, James Chen, and Suh C. Lee as its inventors. Ball Ex. 2. Acer subsequently obtained three continuations of that patent. On April 25, 1995, the '713 patent was published. Plaintiff contends that the '713 patent improperly disclosed the trade secrets Bierman shared pursuant to the 1990 NDA.

On January 3, 1992, Acer and plaintiff entered into a licensing agreement allowing Acer to use Bookmark. Ball Ex. 1. The licensed version of Bookmark allowed Acer's computer to boot up and perform specific features, rather than waiting for the computer to boot up all of its features before completing the desired computing task. During a deposition, Bierman testified that in October 1991 he faxed a written authorization to an Acer employee authorizing Acer to use the purported trade secrets so long as Acer licensed Bierman's software. See Ball Ex. 11 at 371:19-372:9, 209:23-211:16. Plaintiff

3

has pointed to no evidence corroborating Bierman's testimony and the Acer employee

denied he ever received that authorization.  Ball Ex. 6 at 176:1-13.  And neither the

January 1992 license nor a subsequent September 1992 license mentions that apparent

authorization.  See Ball Exs. 1, 13.

**C.    The Patent**

The patented invention is "[a] power management system for a personal computer

comprise[d] [of] a power management processor, a switchable power supply and a keep

alive power supply."  Ball Ex. 2.  Because Acer argues that plaintiff's claims fail if Bierman

is not the sole inventor of the technology claimed by the '713 Family of Patents, Acer

focuses on showing that Bierman did not invent the Power Management Microprocessor

(or "PMM").  The PMM is a microprocessor that is connected to, but independent of, the

computer's main CPU and motherboard (or "host computer").



FIG. 1

Id. at Fig. 1.

1    Essentially, if the power supply is plugged in and the power supply switch is on,

2 the above setup allows the PMM to remain constantly powered by the "keep alive power"

3 connection. As a result, the PMM will continue to function even if the "host computer" is

4 not receiving any power. Because it is always on, the PMM can detect "External Device

5 Interrupts." The PMM also can control the main power supply via the On/Off control and

6 the computer can talk to the PMM via the "interface" connection. See generally id. at

7 6:25-8:22.

8    For example, pressing a soft power switch connected as an "external device"—

9 the normal power button on modern day computers—might tell the PMM that the user is

10 done for the day and to power off. However, unlike a hard power switch, which would

11 shut off all power immediately, once the PMM receives the signal from the soft power

12 switch, the PMM might interface with the host computer directing it to save its memory

13 state for later use. Only after the host computer signals the PMM that that operation has

14 been completed, will the PMM signal the power supply to stop providing power to the

15 host computer. Ball Ex. 2 at 4:36-5:17, 8:1-31.

16    Similarly, the invention provides the ability for a computer in an off state to receive

17 a fax. In short, if a fax machine attached as an "external device" rings, a signal would be

18 sent to the PMM indicating that a fax is incoming. When programmed correctly, the PMM

19 would then tell the main power supply to power the "host computer." The PMM would

20 then direct the host computer that it should not boot up all its functions (because if it did it

21 would miss the incoming fax) and instead only boot up the functions/software needed to

22 receive a fax. See Ball Ex. 2 at 5:18-62.

23    Acer claims that it was the latter-described function that led to James Chen

24 inventing the PMM. Ball Ex. 4 at 45:21-46:13; 66:18-67:1. In 1990, Microsoft released

25 Windows 3.0, which allowed computers to integrate, inter alia, fax machines. Ball Ex. 3

26 at 86:16-88:25. Acer created the AcerPAC 150 to take advantage of that functionality.

27 Id. The PMM was part of the hardware solution to integrating the fax machine and it is

28 undisputed that the licensed Bookmark software was part of the software solution.

1    Plaintiff, however, contends that Bierman contributed more than just the software.

2    **D.    The Alleged Trade Secrets**

3        The court had trouble pinning down exactly what technology plaintiff claims

4    Bierman conceived.  Plaintiff simultaneously contends that Bierman conceived of

5    everything within the patent, while also emphasizing that though some elements of the

6    patent are public, the specific combination of elements is the purported trade secret.[2]

7    The record evidence hues more closely to the former.  Plaintiff's liability expert, Robert

8    Zeidman, opines that "[t]he trade secrets consist of hardware, software, and

9    combinations of hardware and software," Ball Ex. 18 ¶ 5, and describes it as:

> SMART, as disclosed by Intellisoft, is a power control system
> for computers for intelligently controlling a computer's
> switchable main power supply ("PCMP") based on internal
> logic, interrupts, signals from the host computer or software
> operating on the host computer, external devices, and/or
> peripherals connected to the host computer. SMART consists
> of (a) an always powered processor that controls, either directly
> or through an electronic control signal, whether or not the
> computer's switchable main power supply is supplying power
> to the computer system and components of the computer
> system (i.e., a "power management processor"); (b) a method
> for the always powered processor to monitor interrupts,
> communications from the host computer or software operating
> on the host computer, external devices, and/or peripherals
> connected to the host computer (i.e., a "watchdog"); and (c) a
> method for providing continuous power to the always powered
> processor and/or logic and, optionally, other devices that are
> not powered by the computer's switchable main power supply
> (i.e., a "keep-alive power supply" or "standby power").

20    Id. ¶ 6, see also id. ¶¶ 7-37, 39 ("The Intellisoft trade secrets listed above were not

21    generally known individually or in combination").  Bierman, the person who allegedly

22    conceived of the trade secrets, testified that nothing in the patent was Acer's idea and

23    that Acer just built what Bierman invented.  Ball Ex. 11 at 80:2-24, 404:3-8 ("Acer didn't

---

[2] For example, part of the record describes the trade secrets as "a combination of either [1] SMART power supply, SMART power management processor, SMART watchdog, switchable power supply and software that can save and restore the system or [2] all of those things, plus start up options."  Ball Ex. 10 at 333:10-25.  That description is at least conceivably consistent with some or all of the individual elements being public, but the combination of those being an undisclosed trade secret.

create concepts or ideas.  They built . . . the invention that was presented to them").

This court also finds that the scope of the technology claimed by the '713 patent is coterminous with the technology described by plaintiff's trade secret designation.

**E.      ACPI and The Trade Secrets**

The Advanced Configuration and Power Interface ("ACPI") standard is a power management standard developed by Microsoft and Intel with the intention of standardizing certain computer functions.  Around 1996 or 1997, Acer began producing ACPI-compliant computers.  Ball Ex. 7 at 162:9-12; Ball Ex. 8 ¶ 11.

This court has previously described plaintiff's theory of how ACPI relates to the '713 patents and the alleged trade secrets:

> In Zeidman's report, Ex. 9, supplemental report (filed October 10, 2017), Ex. 11, and deposition, Ex. 13, Zeidman compared the purported trade secrets to the '713 Family of Patents and opined that the patents included plaintiff's trade secrets.  See, e.g., Ex. S; see also generally Exs. 9, 11, 13. Zeidman's expert reports also attached 28 separate claim charts, each one analyzing whether [ACPI] . . . "read on" the '713 Family of Patents or necessarily used plaintiff's trade secrets.  See, e.g., Ex. 10 and 12.  In performing this analysis, Zeidman construed the scope and meaning of claims within the '713 Family of Patents.  See Id.  As relevant here, Zeidman concluded that computers using the ACPI industry standard necessarily used the '713 Family of Patents.  Ex. 10 at 35, Ex. 11 ¶ 16; Ex. 12 at 2, Ex. 13 at 332:23-333:9.  Accordingly, it is Zeidman's opinion that computers using the ACPI industry standard incorporate plaintiff's trade secrets.  Ex. 13 at 366:3-6.
>
> Lastly, [plaintiff's damages] [ ] expert['s] report states that Intellisoft is entitled to royalty damages based on every Acer ACPI-compliant computer sold since 1997.  See, e.g., Ex. 14 ¶¶ 8-10, 20.  Napper's calculation expressly relies on Zeidman's and Rappaport's analysis, including Zeidman's conclusion that ACPI compliant computers use the '713 Family of Patents (and, therefore, plaintiff's trade secrets) and Rappaport's inventorship opinion.  Ex. 14 ¶¶ 8-10, 19, 20.

Dkt. 35 at 3-4 (footnote omitted).

Further, plaintiff has consistently argued and its experts have consistently opined that though ACPI does not specify how it should be implemented, "in order to comply with the ACPI specification, a computer would need to incorporate Intellisoft's trade secrets.  I cannot see any way to implement ACPI without doing so."  Ball Ex. 19 ¶ 6.  And Zeidman

testified that comparing the trade secrets to the patents and then the patents to the ACPI standard is logically the same as comparing the trade secrets to ACPI.  Reply Ex. 1 at 332:5-22.

## DISCUSSION

A.     **Legal Standard**

1.     **Summary Judgment**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id. at 248-49.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party has met this burden of production, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial.  Id. at 323.  The court must view the evidence in the light most favorable to the nonmoving party.  See Tolan v. Cotton, 572 U.S. 650, 657 (2014).  If the nonmoving party nevertheless fails to meet its burden, the moving party wins.

2.     **Federal Patent Law Applies To The Inventorship Issue**

a.     **Plaintiff Must Prove He Is An Inventor As Defined by the Federal Patent Laws**

The Federal Circuit has frequently explained that "the field of federal patent law preempts any state law that purports to define rights based on inventorship."  HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co., 600 F.3d 1347, 1353 (Fed. Cir. 2010); Univ. of Colo. Found. v. Am. Cyanamid Co., 196 F.3d 1366, 1372 (Fed. Cir. 1999) (Cyanamid IV).

United States District Court
Northern District of California

1    When "the only possible theory upon which relief could be granted to the plaintiffs would

2    be one in which determining the true inventor" of a patented idea "is essential," federal

3    patent law applies to the issue of inventorship. HIF Bio, 600 F.3d at 1353, 1355;

4    Cyanamid IV, 196 F.3d at 1372.

5        This court has twice previously held that plaintiff's state law claims depend on

6    determining whether Bierman, rather than Acer's employees, invented the ideas claimed

7    by the '713 patent. See generally Dkts. 35, 57. Indeed, this court's subject-matter

8    jurisdiction is based on that finding. Neither plaintiff's rehashed jurisdictional arguments

9    nor any evidence presented in opposition to the present motion provides reason to

10   reconsider those prior findings.

11       The court nevertheless finds it instructive to discuss Univ. of Colorado Found., Inc.

12   v. Am. Cyanamid Co., which bears substantial parallels to the present action and sets

13   forth the applicable law. The Cyanamid plaintiffs, two doctors and various university-

14   related entities, sued a vitamin manufacturer for, inter alia, fraudulent nondisclosure,

15   unjust enrichment, and patent infringement, alleging that the doctors had invented a

16   particular vitamin formulation, and that the manufacturer intentionally omitted them as

17   inventors on the patent application and intentionally hid the patent from plaintiffs. Univ. of

18   Colorado Found., Inc. v. Am. Cyanamid Co., 974 F. Supp. 1339, 1342-44 (D. Colo. 1997)

19   (Cyanamid III). The Cyanamid defendant countered that its employees were the true

20   inventors of the reformulated vitamin and therefore the lawful owner. Id. at 1342. In the

21   first instance, the district court applied Colorado state common law

22   ownership/inventorship standards to plaintiffs' state law claims and federal patent

23   inventorship law to plaintiff's patent infringement claims. Id. at 1353 n.2.

24       The Federal Court rejected that distinction on appeal in Cyanamid IV. In

25   Cyanamid IV, the Federal Circuit reversed the lower court's bench trial determination

26   because the district court applied Colorado common law, rather than Federal patent law,

27   when determining whether plaintiff was the true inventor of the ideas within the patent at

28   issue. Cyanamid IV, 196 F.3d at 1372. The Federal Circuit explained that "the

University's fraudulent nondisclosure and unjust enrichment claims"—both state law claims—"depend on the Doctors' status as inventors[,]" and "whether [defendant] had a duty to disclose its intention to and filing of the Patent application depends on who was the inventor of the reformulated" vitamin. Id. at 1372 (internal quotation marks omitted).

The court determined that while the state law claims were not completely preempted by federal patent law, "federal patent law preempt[ed] states from dictating the standards of inventorship." Id. The court reasoned:

> Field preemption describes exclusive regulation of a legal subject by federal law. To preempt a field, federal law must evince "a scheme of federal regulation so pervasive" that no room remains for a state to supplement. Alternatively, federal law preempts a field by addressing a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."
>
>        *     *     *
>
> An independent inventorship standard under state law would likely have different requirements and give rise to different remedies than federal patent law. A different state inventorship standard might grant property rights to an individual who would not qualify as an inventor under federal patent law, or might grant greater relief to inventors than is afforded by federal patent law. Either situation might frustrate the dual federal objectives of rewarding inventors and supplying uniform national patent law standards.
>
> The federal Patent Act leaves no room for states to supplement the national standard for inventorship. Title 35 contains explicit and detailed standards for inventorship. Moreover, federal law has provided this court with jurisdiction to enforce these comprehensive provisions to provide a uniform national standard for inventorship. Therefore, the field of federal patent law preempts any state law that purports to define rights based on inventorship. Consequently, this court vacates the district court's conclusion that the Doctors were the inventors of reformulated [vitamin] and that Dr. Ellenbogen[, defendant's employee,] was not the inventor. Upon remand, the court must apply federal patent law principles to determine whether the Doctors and/or Dr. Ellenbogen were inventors of the technology of the '634 patent.

Id. (citations omitted; emphasis added).

In accordance with the Federal Circuit's direction, on remand the Cyanamid district court applied federal patent inventorship law not only to plaintiff's federal claims, but also to plaintiff's state law claims of fraud and unjust enrichment because those claims

"hinge[d] on the finding that the doctors invented the subject matter of the [ ] patent." See Univ. of Colorado Found., Inc. v. Am. Cyanamid Co., 105 F. Supp. 2d 1164, 1184 (D. Colo. 2000) (Cyanamid V). The Federal Circuit affirmed. Univ. of Colorado Found., Inc. v. American Cyanamid, 342 F.3d 1298, 1308-09 (Fed. Cir. 2003) (Cyanamid VI).

As was the case in Cyanamid, "[t]he threshold issue [here]. . . is whether [Bierman] w[as], in fact, the true and sole inventors of the patented technology under federal patent, rather than state common law, standards." Cyanamid V, 105 F. Supp. 2d at 1176; see also Gonzalez-Hernandez v. Orbay, No. 08-21782-CIV, 2008 WL 11333594, at *2 (S.D. Fla. June 25, 2008) (refusing to remand because "inventorship is governed solely by federal law" and plaintiff's ownership claim hinged on showing he was the sole inventor).

Rather than addressing the above binding authority, plaintiff asserts that its state law claims do not require a showing that plaintiff is an inventor, that the alleged disclosure occurred within the '713 Patent's specification section and thus does not require an analysis of inventorship, and that this court should instead follow Russo v. Ballard Medical Products, 550 F.3d 1004 (10th Cir. 2008).

### i.    Plaintiff's State Law Claims Requires An Inventorship Determination

Plaintiff first contends that this case does not require an inventorship analysis because the elements of plaintiff's state law claims do not mention "invent" or "conceive." The court disagrees.

To succeed on its misappropriation claim, plaintiff must prove, inter alia, "1. That [the plaintiff] owned [or] was a licensee" of the claimed trade secrets. CACI 4401. That makes sense. A plaintiff cannot recover for an alleged misappropriation of something— here a trade secret—that the plaintiff never owned. In theory, the ownership requirement could be proven in any number of ways. A plaintiff could seek to show that she purchased the trade secret from the undisputed inventor and that is why the plaintiff owns it. Or a plaintiff could seek to prove she inherited the trade secret, or that it was gifted to her rather than to someone else. If plaintiff had chosen any of those theories of

ownership, then the action would belong in state court.  See Tavory v. NTP, Inc., 297 F.

App'x 976, 984 (Fed. Cir. 2008) ("If [ ] [plaintiff's] co-ownership did not depend on

resolving inventorship" then state law claim would not be preempted "because ownership,

as distinct from inventorship, is generally governed by state law."); see also Regents of

Univ. of Cal. v. Chen, No. 16-CV-07396-EMC, 2017 WL 3215356, at *7–8 (N.D. Cal. July

26, 2017) (declining to apply patent law where "the key question is not who invented the

inventions described in the [ ] patents," but "rather when they were invented").

That, however, is not the case here.  Plaintiff's only theory here is that it owns the

purportedly misappropriated trade secret because Bierman invented it.  That theory of

ownership, as discussed above, requires the application of federal inventorship law.

Cyanamid V, 105 F. Supp. 2d at 1172  ("The principal finding of the [Cyanamid IV] was

that the state law concepts of 'ownership' or 'inventorship' previously applied "could not

stand"); see also Tavory, 297 F. App'x at 984, 984 n.8 (state law claim preempted where,

inter alia, co-ownership depended on inventorship analysis).

Of course, plaintiff's breach of contract claim based on the 1990 NDA fails for

similar reasons.  That claim requires plaintiff to prove that Acer did something that the

contract prohibited it from doing—here, disclosing a trade secret or confidential

information that Intellisoft actually owned.  And, like with its trade secret claim, plaintiff

seeks to satisfy that ownership element by showing that Bierman, and not the named

inventors, conceived of the invention claimed by the '713 patent.

During the hearing plaintiff raised a second reason why it believed its claim did not

require an inventorship analysis.  Intellisoft contends that it is not interested in the '713

patent's claimed invention because that went through the patent application and

prosecution process.  Instead, according to plaintiff, the complained of disclosure

occurred within the patent's specification section, as opposed to the patent's claims

section.  Thus, plaintiff's argument continues, patent law does not apply because

Bierman is not claiming he conceived of the patented idea—contained within the claims

section—but the idea disclosed within the specification section of the patent.

While clever (and convoluted), the argument fails to persuade for at least three reasons. First, plaintiff fails to actually identify what part of the specification section purportedly improperly discloses the alleged combination trade secret.

Second, because plaintiff never specifies what in the specification section of the '713 patent disclosed the alleged trade secrets, plaintiff also fails to identify how that alleged but unspecified disclosure differs from the claimed technology. And the court independently has found no basis to believe that the specification section reveals something that the claimed invention does not.

In fact, plaintiff does not really argue that its trade secret is not coextensive with the claimed invention. Rather plaintiff appears to argue that the two are different merely because the claimed invention went through the patent application and prosecution process. That "difference" does not hold water in the face of plaintiff's repeated contention that the claimed trade secrets and the patented technology are the same.

Third, plaintiff unduly seeks to divorce the claimed invention from its specification. Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("The claims, of course, do not stand alone. Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims. For that reason, claims must be read in view of the specification, of which they are a part." (internal citation and quotation marks omitted)).

## ii.    Russo v. Ballard Medical Products

Plaintiff next argues that this court should follow Russo and hold that plaintiff's theory of liability is not premised on patent inventorship. The court recognizes that Russo has certain similarities to the present action. In Russo, the plaintiff, an independent medical device inventor, sued a medical products company alleging that the company misappropriated his trade secret and breached the parties' confidentiality agreement by using certain of the plaintiff's innovations to secure two patents and to subsequently introduce a new product to the market. Russo, 550 F.3d at 1006-08. After the district

court instructed the jury on Utah trade secret and contract law, id. at 1015, the jury found for the plaintiff and awarded $20 million in damages, id. at 1006.

On appeal, the Russo defendant primarily argued that plaintiff's state law claims were preempted by federal patent law. After determining that it, rather than the Federal Circuit, had jurisdiction,[3] the Tenth Circuit turned to arguments pertinent to this action, including whether plaintiff's liability case was "irreconcilable with the presumption of inventorship arising from" defendant's patents. Id. at 1014. Specifically, the defendant argued that plaintiff cast himself as the "true inventor" of the patented ideas and that any question of inventorship must be established under federal patent law standards. The Tenth Circuit disagreed: "Mr. Russo pointed at trial, precisely as he did in his complaint, to Ballard's patents as evidence of how [the defendant] misappropriated his secret and breached the CDA. But this bare fact does not necessarily mean that his trial raised any question of federal patent law . . . let alone suggest that Mr. Russo sought rights associated with being a patent's inventor." Id. at 1015 (emphasis in original).

The Russo court then addressed Cyanamid. Russo explained that Cyanamid IV found that "some of the claims implicated the question of inventorship and the right to exclude the public from using their invention and, accordingly, had to be decided under federal, not state, law." Id. (original emphasis). This court, of course, agrees. As discussed above, Cyanamid left no doubt that if a state law claim hinges on the plaintiff showing that she, and not the named inventor, conceived of the patented technology then federal patent inventorship law applies to the issue of inventorship. See Cyanamid IV, 196 F.3d at 1372.

---

[3] This alone provides reason to believe that the facts of Russo distinguish it from the present action. Russo's jurisdictional analysis essentially mirrors the one this court applied when it denied plaintiff's motion to remand because plaintiff's single theory of liability necessarily raised substantial questions of patent law. If Russo had made the same determination, then it could not have retained jurisdiction because the Federal Circuit has exclusive jurisdiction over such appeals.

In an attempt to distinguish <u>Cyanamid</u>, the Tenth Circuit next explained that "[w]hile <u>some</u> of the [<u>Cyanamid</u> plaintiffs'] claims involved patent law issues that had to be decided under federal law, the Federal Circuit went on to hold that not every claim brought by the doctors did so, [and] explain[ed] that 'federal patent law does not preempt . . . state law claims' for unjust enrichment for 'wrongful use of the Doctors' research results." <u>Russo</u>, 550 F.3d at 1015 (quoting <u>Cyanamid IV</u>, 196 F.3d. at 1371–72) (original ellipses and emphasis). <u>Russo</u> also points out that <u>Cyanamid VI</u> reiterated that point. <u>Id.</u>

That is true too. In both <u>Cyanamid IV</u> and <u>Cyanamid VI</u>, the Federal Circuit rejected the defendant's claim that federal patent law <u>completely</u> preempted plaintiff's state law fraudulent non-disclosure and unjust enrichment claims. However, and critically, that says nothing about whether, when proving those not-preempted state law claims, plaintiff must establish certain elements (or issues) under federal law. And <u>Cyanamid</u> required exactly that. Though plaintiff's state law <u>claims</u> were not completely preempted, field preemption required the <u>Cyanamid</u> plaintiff to prove the inventorship issue under federal patent law. <u>See Cyanamid IV</u>, 196 F.3d at 1372 ("[F]ederal patent law does not preempt [plaintiffs'] state law claims," but because those state law claims "depend on the [plaintiffs'] status as inventors . . . [u]pon remand, the court must apply federal patent law principles to determine" who "were the inventors of the technology[.]"). Here, like in <u>Cyanamid</u>, the court does not hold that plaintiff's state law claims are completely preempted, but rather only that the inventorship issue must be established under federal patent law.

Lastly, <u>Russo</u> itself foresaw the present situation and placed it into the purview of federal patent law. Russo explained that claims "that seek to exclude others from employing a publicly disclosed idea[ ] [ ] must be tried under federal patent law." <u>Russo</u>, 550 F.3d at 1016. That is exactly what plaintiff seeks to do here. Plaintiff premises its royalty-based damages theory not on the now-public technology disclosed by the '713 Family of Patents but instead, and remarkably, on Acer's implementation of

the ACPI standard—a standard released to the public years after Acer applied for the '713 patent and one that plaintiff concedes Microsoft and Intel "independently developed," see Dkt. 72 at 23:8-13. Thus, by seeking to exclude Acer from employing both its own technology and a publicly disclosed technology, plaintiff seeks "rights associated with inventorship of the patents." Russo, 550 F.3d at 1014, 1016; see also Dkt. 35 at 3:23-4:12 (explaining that plaintiff's damages theory seeks royalty damages based on every Acer ACPI-compliant computer sold since 1997), 8:15-25.

Plaintiff's own expert provides further evidence that plaintiff seeks "rights associated with inventorship of the patents." Plaintiff's damages expert opines (with little supporting analysis) that plaintiff is also entitled to the "benefit that Acer gained from its use of the '713 family of patents in its [patent infringement] litigation with HP" and subsequent settlement. Ball Ex. 8 ¶ 23-26. That is, plaintiff seeks to benefit from Acer's patent-based right to exclude HP (and other companies) from using the '713 Family of Patents. The Federal Circuit has spoken definitively on that issue as well: "Thus, [plaintiff's] entitlement here to a portion of any benefits from the enforcement [or royalties] of the patents-in-suit in patent infringement actions stems solely from his entitlement to being joined as a co-owner. Here, since [plaintiff] status as a co-owner depends entirely on whether he was a co-inventor, the dispositive issue is [plaintiff's] alleged co-inventorship, which is governed exclusively by federal patent law." Tavory, 297 F. App'x at 984 (footnote omitted) (alleged co-inventor's unjust enrichment claim "essentially" sought "his share of monies received by [defendant] from the licensing and enforcement of the patents-in-suit . . . which [plaintiff] is allegedly entitled to due to his contribution to the conception of the invention in those patents[.]").[4]

_____

[4] Well after the 11th hour, plaintiff filed a motion for leave to submit two opinions that were published 6 months prior to the court taking the matter under submission. While the court denied that motion, those cases prove unpersuasive and do not change the above analysis. Xitronix Corp. v. KLA-Tencor Corp., 882 F.3d 1075 (Fed. Cir. 2018) (Federal Circuit did not have jurisdiction over action alleging federal antitrust claim premised on an alleged fraud on the USPTO because action did not necessarily depend on resolution of a substantial question of patent law); Broadband ITV, Inc. v. OPENTV, Inc., Case No.

1  **b.** **The Court Must Apply Patent Inventorship Law's Clear and**

2  **Convincing Standard**

3  Defendants next argue that because federal patent law applies to the inventorship

4  issue, plaintiff must provide clear and convincing evidence based on corroborating

5  evidence that Bierman invented the technology in the '713 patent. The court agrees.

6  "Patent issuance creates a presumption that the named inventors are the true and

7  only inventors." Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1460

8  (Fed.Cir.1998). A party challenging inventorship "must meet the heavy burden of proving

9  its case by clear and convincing evidence and must provide evidence to corroborate the

10  alleged joint inventor's conception." Eli Lilly & Co. v. Aragdigm Corp., 376 F.3d 1352,

11  1358 (Fed. Cir. 2004) (internal citation and footnote omitted). "Reliable evidence of

12  corroboration preferably comes in the form of physical records that were made

13  contemporaneously with the alleged prior invention." Trovan, Ltd. v. Sokymat SA, 299

14  F.3d 1292, 1302 (Fed. Cir. 2002). "Circumstantial evidence about the inventive process

15  may also corroborate." Id. at 1303. "Additionally, oral testimony of someone other than

16  the alleged inventor may corroborate." Id. Whether the purported inventor or co-

17  inventor's testimony has been sufficiently corroborated is evaluated under a "rule of

18  reason analysis," which requires a court to consider "all pertinent evidence . . . so that a

19  sound determination of the credibility of the inventor's story may be reached." Price v.

20  Symsek, 988 F.2d 1187, 1195 (Fed. Cir. 1993).

21  Numerous courts have applied that standard to state law claims at summary

22  judgment. See, e.g., Stern v. Trustees of Columbia Univ. in City of New York, No. 01 CIV

23  10086RCC, 2005 WL 398495, at *9 (S.D.N.Y. Feb. 18, 2005) (holding that state law

24  claims failed because plaintiff failed to meet the clear and convincing evidence standard

25  on the inventorship issue), aff'd, 434 F.3d 1375 (Fed. Cir. 2006) (affirming use of clear

26

27  ─────────────────

28  3:17-CV-06647-SK, Dkt. 36 (remanding action to state court because allegedly breached
licensing agreement was not limited to patented technology).

and convincing evidence standard); <u>Cyanamid V</u>, 105 F. Supp. 2d at 1175, 1179 n.9, 1183-85 (same); <u>Cyanamid VI</u>, 342 F.3d at 1308 (affirming <u>Cyanamid V</u>); <u>Memorylink Corp. v. Motorola Sols., Inc.</u>, No. 08 C 3301, 2013 WL 4401676, at *10-11 (N.D. Ill. Aug. 15, 2013) (granting summary judgment on state law claims that depended on plaintiff showing ownership of the patented idea because plaintiff failed to provide clear and convincing evidence that its employees were the "true inventors" of the now-patented idea) aff'd sub nom. <u>Memorylink Corp. v. Motorola Sols., Inc., Motorola Mobility, Inc.</u>, 773 F.3d 1266 (Fed. Cir. 2014).  This court will do the same.

### c.    Patent Inventorship Law

The Federal Circuit has repeatedly explained:

> Conception is the touchstone of invention, and it requires a definite and permanent idea of an operative invention, including <u>every feature</u> of the subject matter sought to be patented.  An idea is definite and permanent when the inventor has a specific, settled idea, a <u>particular solution</u> to the problem at hand, not just a general goal or research plan."

<u>In re VerHoef</u>, 888 F.3d 1362, 1366 (Fed. Cir. 2018) (internal citations and quotation marks omitted; original emphasis).  "Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." <u>Burroughs Wellcome Co. v. Barr Labs., Inc.</u>, 40 F.3d 1223, 1228 (Fed. Cir. 1994).

"When an invention is made jointly, the joint inventors need not contribute equally to [an invention's] conception."  <u>In re VerHoef</u>, 888 F.3d at 1366.  A joint inventor must:

> (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art.

<u>Id.</u>  That is, a purported sole inventor must prove that she alone conceived of the entire invention, which may include showing that all of the other inventors—here, the named inventors—failed to meet one of the above elements.

Whether the purported inventor is the sole inventor or a co-inventor proves to have important consequences. "[E]ach co-inventor presumptively owns a pro rata undivided interest in the entire patent, no matter what their respective contributions." Univ. of Utah v. Max-Planck-Gesellschaft Zur Forderung Der Wissenschaften E.V., 734 F.3d 1315, 1324 (Fed. Cir. 2013); Ethicon, 135 F.3d at 1460 ("A contribution to one claim is enough" to be a co-inventor). In contrast, a sole inventor would—barring other factors not present here—have sole ownership and use of the patent.

**B.    Analysis**

**1.    Plaintiff Has Not Presented Clear and Convincing Evidence That Bierman Is An Inventor or Co-Inventor**

The court next turns to whether plaintiff has submitted evidence sufficient to prove "by clear and convincing evidence"—including evidence corroborating Bierman's own testimony—that Bierman conceived of (or partially conceived of) the technology within the '713 patent.

As an initial matter, plaintiff's counsel conceded at the hearing that if the court determines that patent law's clear and convincing standard applied (which the court has), then summary judgment should be granted. Dkt. 82, Hr'g Tr. at 13:19-14:14 ("If [patent law] is what the court is going to analyze this under . . . then we concede because there's no way for us to be able to move forward and prove under that law."). While this court does not rely only on that candid concession, the court concurs with it.

Regarding plaintiff's sole inventorship claim, Acer focuses on showing that Bierman did not invent the PMM. As described above, the PMM is a microprocessor that exists and functions independently from the host computer, remains constantly powered, and is designed to detect incoming external signals when the host computer is off. Ball Ex. 2. Similarly, plaintiff's trade secret designation describes "SMART" as "a separate power supply" that "needed to always remain powered" and "would act as a watchdog and control the PC's conventional switchable main power supply." Ball Ex. 35 at 13-14. Further, like the PMM, "SMART's watchdog capability would monitor, communicate and

control requests via interrupts by devices requesting or requiring a power on or power off of the" main power supply.  Id. at 15.  Bierman testified that PMM and "SMART" are equivalent.  Ball Ex. 11 at 159:20-21.

Though it was not their burden to do so, defendants presented extensive evidence that Chen invented the PMM.  Ball Ex. 4 at 45:21-46:13 (Chen testimony: Q. . . . "Who came up with the idea to use a [PMM] in this invention?  A. Mine."); id. at 93:2-24; Ball Ex. 3 at 126:4-17; Ball Ex. 5 at 125:5-13; Ball Ex. 6 at 88:20-21.

In response, plaintiff does not present any evidence that corroborates Bierman's testimony that he invented the PMM.  Plaintiff first points to thirteen documents that purportedly show Bierman conceived of the PMM.[5]  But twelve of those documents only pertain to Intellisoft's software and do not mention hardware, much less microprocessors generally, or any microprocessor or idea resembling the PMM.  See Ball Ex. 21-22, 24-32; Pltf's Ex. 32.  In the thirteenth document, a January 1995 email, an employee in Acer's IP department asks White (a named co-inventor of the '713 patents), to provide information to assist Acer's participation in an annual invention award.  Pltf's Ex. 33.  Importantly (and dispositively), the email makes no mention of Bierman or Intellisoft and thus says nothing about whether Bierman conceived of the PMM, or any other part of the disputed technology.

Plaintiff nevertheless argues that those documents are circumstantial evidence that Bierman invented the patented trade secrets because Bierman created and shared the documents with Acer over 25 years ago.

The court disagrees.  Certainly, the documents provide circumstantial (and direct) evidence of certain things, including (1) that Acer entered into an NDA with Bierman in 1990 to potentially license a unique version of Intellisoft's software, (2) that Intellisoft

---

[5] Plaintiff produced eleven documents in response to defendants' request for all documents that allegedly disclosed the alleged trade secret before January 2, 1992.  Ball Exs. 21-22, 24-32.  Plaintiff's opposition pointed to two additional documents.  Pltf's Exs. 32-33.

disclosed and discussed that software with Acer, and (3) that Acer licensed a version of that software in 1992. But evidence that Bierman discussed and disclosed software ideas is not equivalent to circumstantial evidence of Bierman's conception of the PMM. Tellingly, plaintiff fails to describe how the documents relate to the PMM, or any other specific part of the patent. Moreover, even if the documents did have a fleeting reference to the PMM (and the court finds that they do not), that would not be enough. The corroborating evidence must show that Bierman had a "clearly defined" idea, such that "only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." Burroughs Wellcome, 40 F.3d at 1228. Nothing in the cited documents come close to describing the PMM and the documents certainly did not reveal to Acer a clearly defined idea for the PMM—or any other part of the patent. See Coleman v. Dines, 754 F.2d 353, 360 (Fed. Cir. 1985) ("The evidence did not show that Coleman's 'completed thought' was disclosed to others."); Caterpillar Inc. v. Sturman Indus., Inc., 387 F.3d 1358, 1380 (Fed. Cir. 2004) (reversing district court because presentation revealing 2-way valve and 3-way valve but not the patented 3-way spool integrated valve did not meet clear and convincing standard).[6]

Plaintiff next points to the testimony of Dirk Wesseling, who was one of Intellisoft's software engineers and wrote the source code for Bookmark. Pltf' Ex. 36 at 45:6-19. Bierman identified Wesseling as the only person who could corroborate Bierman's inventorship story. Wesseling did not do so. The cited testimony shows that Wesseling corroborates Bierman's undisputed claim that he invented certain software. Pltf's Ex. 36 at 45:6-19; 46:2-11; 47:24-48:22). But when asked whether he knew who conceived of the PMM-type idea, Wesseling stated he did not know if it was Acer or Bierman. Ball Ex. 17 at 197:25-198:5; Pltf's Ex. 35 at 140:23-141:5.

Plaintiff also argues that Chen designed and built the hardware per the

---

[6] For the same reason, the documents do not suggest that Bierman made a significant contribution to the PMM's conception.

1    specifications given to him by Bierman.  Again, the cited evidence does not support

2    plaintiff's contention.  Chen testified that Kiremidjian told him "what kind of functionality"

3    was needed and "based on that, [Chen] came up with the design of the hardware . . ."

4    Pltf's Ex. 20 at 31:1-22, 143:17-144:6 (similar).  That does not show that Bierman

5    conceived of the PMM, or any other part of the patent.  Further, even if Bierman had told

6    Kiremidjian about the desired functionality—which there is no corroborating evidence of—

7    and even if Kiremidjian then passed that on to Chen—which there is no corroborating

8    evidence of—Chen still conceived of how to achieve that functionality, i.e., he designed

9    the "operative invention."

10        More generally, plaintiff's various arguments aimed at attacking the named

11   inventors do not satisfy plaintiff's burden because "[e]ven if [Acer] and [its] co-inventors

12   did not conceive of the invention, that fact alone does not prove that [Bierman] did

13   conceive of the" PMM.  Tavory, 297 F. App'x at 981.

14        The court also finds that plaintiff has not presented any corroborating evidence

15   that Bierman is a co-inventor of the disputed technology.  Plaintiff fails to articulate what it

16   is Bierman allegedly contributed to the patent's claimed invention, much less prove with

17   corroborating evidence that Bierman made that unspecified contribution.  Plaintiff also

18   fails to present any corroborating evidence that Bierman disclosed that unspecified

19   contribution or idea to an Acer employee.  Nor has plaintiff presented any corroborating

20   evidence that Acer misappropriated and disclosed that unspecified contribution

21   somewhere within the '713 patent.  And merely providing a software that the patented

22   technology interacts with is insufficient.  Hess v. Advanced Cardiovascular Sys., Inc., 106

23   F.3d 976, 981 (Fed. Cir. 1997) (affirming lower court's conclusion that plaintiff was not a

24   co-inventor by virtue of, inter alia, "supplying a product to [the named inventors] for use in

25   their invention").  Lastly, as discussed below, even if plaintiff had shown that Bierman

26   was a co-inventor, plaintiff has not presented a corresponding cognizable damages

27   theory.

28        In sum, the court finds that plaintiff has failed to present any corroborating

1    evidence, much less clear and convince evidence, that Bierman invented the PMM or co-

2    invented the patented technology.  Without such evidence, plaintiff cannot strip Acer of its

3    patent rights on the contention that (essentially) Bierman had the idea first.  And plaintiff

4    can certainly not do so when there is no corroborating evidence of either Bierman's

5    conception or his disclosure to Acer.  For the above reasons, the court GRANTS

6    defendants' motion for summary judgment because plaintiff cannot prove ownership of

7    the disputed technology and therefore his trade secret and contract claims fail.

8         **2.    Whether Summary Judgment Must Be Granted Because Plaintiff**

9              **Cannot Prove Damages**

10             **a.    Napper's Damage's Analysis Necessarily Assumes That**

11                  **Bierman Was The Sole Inventor**

12             As explained above, "Each co-owner of a United States patent is ordinarily free to

13    make, use, offer to sell, and sell the patented invention without regard to the wishes of

14    any other co-owner."  Schering Corp. v. Roussel-UCLAF SA, 104 F.3d 341, 344 (Fed.

15    Cir. 1997).  Thus, so long as the named inventors invented some part of the patent, then

16    Acer had a right to use the patent without regard to any other purported co-inventor's

17    wishes.

18             That directly contrasts with plaintiff's damages expert's premise for calculating

19    damages, which this court has previously found necessarily assumes that Bierman is the

20    sole inventor.  Plaintiff's damages expert assumes that Acer initially breached the NDA

21    by applying for the '713 patent.  Ball Ex. 8 ¶ 17.  In addition, plaintiff's damages expert

22    assumes that implementation of the ACPI standard requires the use of plaintiff's trade

23    secrets, id. ¶ 21 n. 40, and thus all of Acer's ACPI-compliant computers sold after 1997

24    used plaintiff's trade secrets without Intellisoft's authorization, id. ¶¶ 11, 12, 21.  However,

25    rather than setting forth two damages analysis—one based on the patent's purported

26

27

28

                                    23

disclosure and one based on Acer's ACPI-compliant computers—Napper only calculated

royalties based on each ACPI-compliant computer Acer sold after 1997.[7] Id. ¶¶ 20, 21.

That theory of damages necessarily assumes that Bierman is the sole inventor of

the disputed technology. That is because if Acer is even a co-inventor of that technology,

then Acer is free to use the patented invention without regard to the wishes of any other

co-inventor. Based on co-inventorship alone, plaintiff cannot rip away Acer's right to use

a technology that it (at least in part) invented. And plaintiff certainly cannot do so when

there is no corroborating evidence that Bierman conceived of any part of the patented

technology.[8]

**b.      Assuming Bierman Was A Co-Inventor, There Is No Evidence of**

**Intellisoft's Damages.**

Even assuming Bierman co-invented the patented idea, plaintiff provides no

evidence of the amount of damages Intellisoft suffered. Again, Cyanamid IV provides the

appropriate framework. There, the Federal Circuit instructed that:

> If the court finds that the Doctors jointly invented the
> reformulated product with [the currently named inventor], the
> financial opportunity that the University [who employed the
> doctors] could have lost was the payment that Cyanamid would
> have made to secure the Doctors' cooperation in filing the
> required documents with the PTO, such as oaths and
> declarations. Because federal patent law allows joint owners
> to practice a patented technology without accounting to the
> other co-owners, Cyanamid would not have needed to acquire
> ownership of the patent or licenses thereunder. . . . the district
> court could [also] find that Cyanamid would have also paid the
> University for either an assignment of the University's
> ownership in the [ ] patent or an exclusive license thereunder.

Cyanamid IV, 196 F.3d at 1373.

That is, plaintiff could have presented evidence regarding how much Acer would

have paid to secure Bierman's cooperation in applying for the '713 patent application.

Alternatively, plaintiff could have presented evidence showing the amount Acer would

---

[7] Napper performed the same calculation using 2000 as a start date. Ball Ex. 8 ¶ 22.

[8] Napper's report also references a "Disgorgement" damages theory, but never completes that analysis. See Ball Ex. 8 ¶ 23-26.

1    have paid for an assignment of Intellisoft's interest in the technology.  Plaintiff did neither.

2    Instead, plaintiff's damages theory essentially seeks to exclude Acer from using its own

3    technology, unless Acer licenses that technology from plaintiff.

4                    **c.    Plaintiff's Damages Theory Fails Because It Is Based On Acer's**

5                    **Implementation of the ACPI Standard.**

6              Independent of the two above grounds, summary judgment must be granted

7    because plaintiff's only damages theory is premised on Acer's implementation of ACPI,

8    an independently developed and <u>publicly disclosed</u> standard.

9              Plaintiff alleges that Bierman disclosed the alleged trade secrets to Acer after the

10   parties executed the 1990 NDA.  Plaintiff also alleges that Acer misappropriated those

11   trade secrets and applied for a patent in January 1992, thereby disclosing the trade

12   secrets.  Subsequently, Microsoft and Intel publicly disclosed the ACPI standard around

13   1996.  Plaintiff does not contend that Microsoft or Intel (or any other company involved in

14   the release of ACPI) misappropriated plaintiff's trade secrets.  Lastly, as discussed

15   above, plaintiff's sole damages theory calculates royalties based on every Acer <u>ACPI-</u>

16   <u>compliant</u> computer produced after 1997.

17             Those facts have significant consequences.  First, plaintiff has presented no

18   damages evidence for the period between 1992 and 1997.  Second, because ACPI was

19   independently developed and disclosed, nothing prohibited Acer from implementing it.

20   <u>See</u> Ball Ex. 21 (NDA) ¶ 2 (excluding liability for use of publicly known information); Cal.

21   Civ. Code § 3426.1 (derives value from not being known to the general public); <u>Mattel,</u>

22   <u>Inc. v. MGA Entm't, Inc.</u>, 782 F. Supp. 2d 911, 963 (C.D. Cal. 2011) ("the UTSA does not

23   prevent a person from using independently developed or properly obtained trade secret

24   information already in the possession of another.").

25             Plaintiff responds that Acer is liable because, according to plaintiff's expert, "in

26   order to comply with the ACPI specification, a computer would need to incorporate

27   Intellisoft's trade secrets."  Ball Ex. 19 ¶ 6.  But if countless other computer companies

28   implemented ACPI without stealing Intellisoft's trade secrets, then there is no reason to

think that Acer could not do the same using ordinary skills in the art. Plaintiff's own expert recognized that fact. Dkt. 77-1, Pltf's Exs. 42 at 335:7-17 ("one of ordinary skill in the art would know [to use the trade secrets] . . . to implement the ACPI specification"). Again, nothing prohibits Acer from implementing an independently developed and publicly disclosed idea, even if that idea matches a technology that plaintiff previously kept as a trade secret.[9]

For each of the above reasons, the court GRANTS defendants' motion for summary judgment.

### 3. Whether Plaintiff's Claims Are Time-Barred

Independent of the above, and alternatively, the court GRANTS defendants' motion for summary judgment because plaintiff's claims are time barred.

"An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Cal. Civ. Code § 3426.6. An action for breach of a written contract must be brought within four years. Cal. Civ. Proc. § 337(1).

"A plaintiff must bring a claim within the limitations period after accrual of the cause of action." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 806 (2005). "An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." Id. at 807 (internal citations omitted). The California Supreme Court has "set[ ] forth two alternate tests for triggering the limitations period: (1) a subjective test requiring actual suspicion by the plaintiff that the injury was caused by wrongdoing; and (2) an objective test requiring a showing that a reasonable person would have suspected the injury was caused by wrongdoing. The first to occur under these two tests begins the limitations period." Nguyen v. W. Digital Corp., 229 Cal. App. 4th 1522, 1552,

---

[9] Nor has plaintiff argued (or provided evidence) that it should receive damages based on any head start Acer might have had in implementing ACPI because of its purported misappropriation of plaintiff's trade secrets.

(2014); see also CACI 455.

The parties appear to agree that Bierman did not have an actual suspicion until July 2013. Pltf's Ex. 12 at 529:19-23. Defendants, however, argue that plaintiff had reason to suspect the injury in the mid-to-late 1990s when ACPI-compliant computers and the "soft switch" became ubiquitous. The court agrees.

Plaintiff consistently argues, and its experts consistently opine, that computers cannot implement ACPI without using the alleged trade secrets. See, e.g., Ball Ex. 10 at 366:3-6; Ball Ex. 18 ¶ 57. It is also undisputed that Bierman learned of ACPI when it was released in the mid-1990s. Ball Ex. 34 at 406:14-21. In addition, plaintiff and Bierman claim that the soft switch is an essential component of the purported trade secret, Ball Ex. 23 at 86:24-87:3 ("one of the requirements of the invention" was a "soft switch"); Ball Ex. 35 at 8:22-25 ("Enable the new power push button, eliminating the light-switch on/off type implementation, to control a PC system's power supply . . ."), at 16:8-11; Ball Ex. 18 ¶ 12 ("Intellisoft proposed a 'soft switch' that sent a signal to a PC."), which the parties do not dispute has been ubiquitous since the mid-1990s. See Wolfe Decl. ¶ 13. Lastly, as of 1992, Bierman knew how to identify his claimed trade secret combination when present in a computer. Ball Ex. 11 at 83:20-97:16 (Bierman explaining how he confirmed an Acer prototype contained his trade secrets). One such indication, according to Bierman, was the presence of a soft switch. Id. at 85:18-86:4.

A reasonable person knowing those facts would have suspected that his trade secret had been misappropriated.[10] If Bierman invented the soft switch or if his purported invention required a soft switch, the ubiquity of such a device would have put him on

_____

[10] Though neither party addresses the issue, Bierman should have suspected someone misappropriated his trade secrets based on the ubiquity of computers featuring hibernate/sleep modes. Plaintiff's expert opined that that feature was also indicative of a computer using plaintiff's trade secrets and used the presence of that feature to identify which Acer computers used plaintiff's trade secrets. Ball Ex. 18 ¶ 72, ¶ 75 ("running windows 98, which allows hibernate mode"); ¶ 77 (same for Windows vista); ¶ 79 (same for Windows 10). It beggars belief that between December 1997 and 2010, Bierman did not notice the Windows hibernate feature.

notice that his trade secret may have been misappropriated. Similarly, if the ACPI standard <u>required</u> the implementation of Bierman's trade secrets, then Bierman (or plaintiff) should have suspected his trade secrets had been misappropriated in the mid-1990s when Bierman admittedly knew of ACPI's release.[11] Considering plaintiff contends only that Bierman disclosed the trade secrets to Acer, Acer was the most reasonable suspect. And, in any event, the discovery period ceases once Bierman had reason to suspect <u>someone</u> had misappropriated his trade secrets, even if Bierman had not yet identified the culprit. <u>See</u> <u>Bernson v. Browning-Ferris Industries</u>, 7 Cal. 4th 926, 932 (1994) ("[T]he general rule in California has been that ignorance of the identity of the defendant is not essential to a claim and therefore will not toll the statute."); <u>Norgart v. Upjohn Co.</u>, 21 Cal. 4th 383, 397-98 (1999) ("the plaintiff discovers the cause of action . . . when, simply put, he at least suspects that someone has done something wrong to him " and explaining that is why Doe defendants may be named).

Accordingly, the court holds that Bierman and plaintiff had reason to suspect that he had been harmed and was therefore required to "conduct a reasonable investigation of all potential causes of that injury." <u>Fox</u>, 35 Cal.4th at 808. The burden thus shifts to plaintiff to show that "despite diligent investigation of the circumstances of the injury . . . [it] could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." <u>Id.</u> at 809.

Rather than providing evidence that such an investigation was not fruitful, plaintiff puts forth two unpersuasive arguments. First, plaintiff argues that any investigation triggered by ACPI would have only revealed that ACPI was independently developed. That contention is incorrect. According to plaintiff, implementation of ACPI requires the use of plaintiff's trade secrets. Thus, any investigation into Acer's—the only company who Bierman purportedly disclosed the trade secret to—implementation of ACPI would

---

[11] Moreover, in 2005, Bierman owned an ACPI-compliant computer that used a soft switch. <u>See</u> Ball Ex. 36 at 4:24-5:12; Wolfe Decl. ¶¶ 7, 10.

United States District Court
Northern District of California

1    necessarily reveal that Acer was using Intellisoft's purported trade secret.  Plaintiff cannot

2    both claim that every Acer ACPI-compliant computer constitutes a use of its trade

3    secrets, while at the same time claiming that an investigation into ACPI would not reveal

4    the use of those same trade secrets.

5        Second, plaintiff argues that the presence of the soft switch would not put Bierman

6    on notice because plaintiff alleges a combination trade secret.  That argument has

7    already been rejected above.  Because plaintiff and Bierman assert that the soft switch is

8    essential to the purported trade secret, the presence of the soft switch (even if not a trade

9    secret itself) would have put a reasonable person on notice that there was something to

10   investigate.  Under plaintiff's theory, that investigation would have revealed Acer's

11   purported misappropriation of Bierman's trade secret.

12       For the above reasons, the court GRANTS defendants' motion for summary

13   judgment because plaintiff's claims are time barred.[12]

14                                  **CONCLUSION**

15       For the foregoing reasons, the court GRANTS summary judgment in favor of

16   defendants on plaintiff's misappropriation of trade secrets claim and breach of contract

17   claim because plaintiff's have failed to show with clear and convincing evidence that

18   Bierman invented or co-invented the patented technology and, thus, plaintiff's have failed

19   to show they had any ownership right over that technology.  In the alternative, the court

20   GRANTS summary judgment on those claims because plaintiff's only damages theory

21   depends on a finding that Bierman alone invented the patented technology, which plaintiff

22

23   [12] In addition, the complaint states that on February 6, 2002, "Bierman sold all
     outstanding shares in Intellisoft and his personal intellectual property to Angelo DiLeva"
24   and DiLeva did not relinquish ownership until July 14, 2006.  Ball Ex. 14 ¶ 24.  "It is
     [plaintiff's] burden to prove lack of knowledge throughout the entire history of the
25   existence of his trade secrets[.] . . . However, [plaintiff] has provided no evidence showing
     that he can do so for the period of time that the intellectual property was owned by
26   [DiLeva]."  Bierman v. Int'l Bus. Mach. Corp., Case No. 10-cv-4199-PJH, 2012 WL
     506562, *7 (N.D. Cal., Feb. 15, 2012) aff'd sub nom., 547 F. App'x 851 (9th Cir. 2013).
27   Further, as was the case for Bierman, the court doubts that DiLeva failed to notice the
     presence of Windows' hibernate feature, ACPI, or soft switches on computers between
28   2002 and 2006.

has failed to prove under the applicable standard, and because plaintiff's claims are time barred.  Because plaintiff's accounting claim and its intentional misrepresentation and concealment claim rise and fall with plaintiff's other two causes of action, the court GRANTS defendants' motion for summary judgment on those claims as well.

As this order disposes of all claims in plaintiff's operative complaint, defendants' counterclaim is the only remaining claim in this action.  The parties shall meet and confer by December 21, 2018, and file a joint status statement by January 4, 2019, that addresses how this action should proceed to resolution.

**IT IS SO ORDERED.**

Dated: December 6, 2018

_____
PHYLLIS J. HAMILTON
United States District Judge